UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| ANTHONY C. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 2:20-CV-256-KAC-CRW |
| | ) | |
| SKF USA INC. and ALEMITE, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER
## DENYING PLAINTIFF'S MOTION TO STRIKE AND GRANTING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT IN PART

This case is before the Court on (1) Defendants' "Motion for Summary Judgment," [Doc. 37], and (2) "Plaintiff's Motion to Strike Affidavits of Steve Wareham, Nancy McGinty, and Dr. Steven Lawhon," [Doc. 57]. For the reasons below, the Court **DENIES** Plaintiff's "Motion to Strike" [Doc. 57]. In addition, the Court **GRANTS** Defendants' "Motion for Summary Judgment" [Doc. 37] **IN PART**. Specifically, the Court **GRANTS** summary judgment to Defendants with respect to Plaintiff's claims for failure to accommodate or engage in the interactive process under the Americans with Disabilities Act (Count One) and violation of the Tennessee Public Protection Act (Count Three) but **DENIES** summary judgment with respect to Plaintiff's "regarded as" claim under the Americans with Disabilities Act (Count Two).

## I. BACKGROUND[1]

Defendant SKF USA Inc. ("SKF") is the United States-based subsidiary of SKF AB [Doc. 37-2 at 7 (Deposition of Steve Wareham ("Wareham Dep."), 18:4-6)]. Defendant Alemite,

---

[1] Because Plaintiff is the non-moving Party, the Court describes the facts in the light most favorable to him. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

LLC ("Alemite") is a subsidiary brand division of SKF, primarily serving the lubrication industry [*See id.* (Wareham Dep., 18:17-22)]. Alemite's operations include a primary manufacturing facility in Johnson City, Tennessee [*Id.* at 8 (Wareham Dep., 20:12-15)].

In June 2016, Alemite hired Plaintiff Anthony "Tony" White to work as a Group Purchasing Buyer at its Johnson City facility [*See* Docs. 37-4 (Offer Letter); 37-5 (Position Description, Buyer)].[2] As a Buyer, Plaintiff was responsible for buying steel for SKF's lubrication business, which involved (1) participating in the evaluation and selection of suppliers; (2) negotiating and implementing contracts, agreements, and new processes with suppliers; and (3) providing support and guidance throughout the procurement cycle [*See* Docs. 37-5; 37-1 at 25-27 (Deposition of Anthony C. White ("White Dep."), 184:15-186:5)]. Communication and interpersonal skills were an "important part of" Plaintiff's job [Doc. 37-1 at 26 (White Dep., 185:5-23)].

Shortly after Plaintiff joined the company, his immediate supervisor, Holly Fletcher, promoted him to the position of Senior Buyer [*See* Docs. 38-2 at 7 (Deposition of Holly Fletcher ("Fletcher Dep."), 33:17-23); 37-6 (Position Description, Senior Buyer)]. As Senior Buyer, Plaintiff maintained his prior responsibilities and also (1) conducted supplier evaluations and audits as delegated by management; (2) drove and managed sourcing projects; (3) performed sourcing activities and market analysis; and (4) defined appropriate sourcing strategies [*See* Docs. 37-6; 37-1 at 36-38 (White Dep., 199:17-201:22)]. Plaintiff's Senior Buyer job duties also required regular travel [Doc. 37-1 at 21 (White Dep., 154:5-8)].

---

[2] Plaintiff was an at-will employee, and Defendants "reserve[d] the right to terminate [Plaintiff's] employment at any time with or without cause, warning, or notice" [Doc. 37-3 at 10].

Prior to his employment with SKF, Plaintiff was diagnosed with anxiety and adjustment disorder [*See* Docs. 38-8; 38-1 at 8 (White Dep., 76:3-5); 38-2 at 15 (Fletcher Dep., 193:17-22)]. However, by the time Plaintiff began working at SKF, his conditions were medically controlled and did not require accommodation [*See* Docs. 38-1 at 11 (White Dep., 149:1-14); 38-8 at 2]. Fletcher testified that, although Plaintiff was "a little quirky" and she "personally thought he may be on the [autism] spectrum a little bit," "[a] lot of the quirkiness [she] really overlooked because his performance in terms of the hard skills were good" [Doc. 38-2 at 8-9, 19 (Fletcher Dep., 36:22-37:22, 197:11-25)]. Fletcher also stated that Plaintiff was generally receptive and open to her feedback [*Id.* at 10-11 (Fletcher Dep., 43:8-9, 45:13-19)].

Around February 2018, Plaintiff received a rating of "Full Achievement" during a performance evaluation, but he felt that he was "at the Above Achievement and/or Superior Achievement level" [Doc. 37-1 at 39 (White Dep., 202:8-15)]. Fletcher held a meeting with Plaintiff to review the performance evaluation [*Id.* at 41 (White Dep., 207:6-19)]. According to Plaintiff, he was "embarrassed" during the meeting and "got up and walked out" [*Id.*]. Fletcher, however, described the meeting differently, explaining that Plaintiff "blew up," "became very defensive and was talking really fast," which "scared" her [Doc. 37-7 at 8 (Fletcher Dep., 46:8-16)]. But Fletcher "did not recall" "any displays of aggression" during Plaintiff's tenure with SKF [Doc. 38-2 at 17 (Fletcher Dep., 195:18-23)].

On April 9, 2018, Fletcher met with Plaintiff to discuss his reaction to the performance review and the need to improve his communication skills [*See* Doc. 37-1 at 43-45 (White Dep., 218:4-220:15)]. Plaintiff agreed to take an emotional intelligence training, [*id.* at 43 (White Dep., 218:20-25)], and Fletcher referred Plaintiff to SKF's Employee Assistance Program ("EAP") [Doc. 37-9 (4/23/2018 Email between Wareham and Fletcher)]. On April 30, 2018, Plaintiff and

3

Fletcher officially executed an EAP referral pursuant to their April 9, 2018 conversation [Doc. 37-10 at 2 (4/30/2018 Email between Wareham and Fletcher)].[3]

In April 2018, Fletcher also requested that Plaintiff visit a potential supplier, Unilube, to obtain information to assist her in assessing whether to approve Unilube as a supplier [Doc. 37-1 at 46-47 (White Dep., 222:23-223:13)]. Defendants' relationship with Unilube arose outside of the normal process for approving vendors; an Alemite employee "was soliciting an SKF buyer to approve his company [Unilube] without normal visitation and normal SKF procedures" [Doc. 38-2 at 13 (Fletcher Dep., 90:11-13); *see also* 38-3 at 4-5 (Deposition of Jon Stevens ("Stevens Dep."), 47:16-48:5)]. Plaintiff visited Unilube's facility in Dallas, Texas on April 10, 2018 and discovered "a lot of unusual circumstances" regarding its operations, including "misrepresentations and unusual business connections with Alemite sales & Unilube" [Doc. 37-11 at 4-5 (4/13/2018, 10:19 A.M. Email between Fletcher and White); *see also* Doc. 37-13 (4/16/2018 Email)]. Plaintiff first voiced his concerns to Fletcher, who appeared receptive and encouraged Plaintiff to investigate those concerns [Doc. 37-1 at 50-51 (White Dep., 228:24-29:20)]. Plaintiff also reported his concerns to Thomas Lake, SKF's Group Purchasing Contract and Compliance Manager [Docs. 37-11; 37-1 at 52-53 (White Dep., 230:2-231:4)]. Lake likewise encouraged Plaintiff to continue his investigation [Doc. 37-1 at 54 (White Dep., 235:10-14)].

After further investigation, Plaintiff told Fletcher that the information Unilube provided "sound[ed] good" to him [*Id.* at 55 (White Dep., 237:12-13); Doc. 37-12 (4/13/2018, 1:01 P.M. Email between Fletcher and White)]. Based on Plaintiff's representations, Fletcher initially

---

[3] The EAP referral states that the incidents precipitating the referral include: (1) "communicating in middle of night;" (2) "communicating in an aggressive manner (emotional);" (3) "communicating in a way that 'threats' [sic] to go to upper [management] without discussion with [manager] first — or [without] further discussion [with manager] for things not clearly understood" [Doc. 37-10 at 3-5 (4/23/2018 EAP Referral)].

4

approved Unilube as a supplier [Docs. 37-1 at 55-56 (White Dep., 237:24-238:9); 37-12]. However, soon after Fletcher approved Unilube, Plaintiff notified "everybody," including Fletcher and Theodore Barry, SKF's Vice President and General Counsel, that he still had concerns [Doc. 37-1 at 57-58 (White Dep., 242:16-20, 245:3-7)]. As a result, on April 20, 2018, Fletcher asked the employee who brought Unilube to SKF's attention to "remove [himself] from any discussion" relating to Unilube due to "many code of conduct/ethical questions" [*See* Doc. 37-14 (7/19/2018 Email)].

Plaintiff testified that after he reported his concerns with Unilube, Fletcher's actions towards him "immediately changed" [*See* Doc. 38-1 at 20-22 (White Dep., 247:12-248:1, 252:5-19)]. Fletcher began scrutinizing Plaintiff's routine expense reports, removed him from projects, and began criticizing or downplaying Plaintiff's work to superiors [*See id.*]. On May 24, 2018, Plaintiff submitted a formal complaint through SKF's online compliance hotline, which included allegations of potential antitrust violations with Unilube and retaliation against Plaintiff [Doc. 38-6 (Hotline Report)]. Jon Stevens, SKF's Chief Compliance Officer, investigated the complaint [*Id.*]. Stevens concluded that the Alemite employee who solicited the approval of Unilube as a supplier did not adhere to SKF's internal procedures, [Doc. 37-16 at 7-8 (Stevens Dep., 55:16-56:12)], but did not find evidence of antitrust issues or retaliation against Plaintiff, [Doc. 37-16 at 14 (Stevens Dep., 90:20-25)]. Ultimately, Fletcher revoked Unilube's approval, [Doc. 37-7 at 15 (Fletcher Dep., 78:13-19)], and the hotline complaint investigation was closed on June 21, 2019, [Doc. 38-6 at 2].

Following the events of April 2018, Plaintiff began experiencing renewed symptoms of his anxiety and adjustment disorder [*See* Doc. 38-1 at 25-26 (White Dep., 276:11-277:10)]. Plaintiff was also in a car accident in May 2018 and experienced a house fire in June 2018 [*See id.*]. And

5

in September 2018, Plaintiff's wife was diagnosed with an aggressive cancer [*See* Doc. 37-1 at 63 (White Dep., 279:14-19)]. She quickly lost all mobility and required extensive care [*See* Doc. 38-1 at 28 (White Dep., 280:21-24)]. Plaintiff was approved for intermittent leave under the Family and Medical Leave Act (FMLA) to care for his wife [*See* Doc. 37-1 at 64-65 (White Dep., 285:10-286:4)].

According to Fletcher, Plaintiff "fell apart" following his wife's cancer diagnosis and became "very reclusive," failing to attend meetings and communicate [Doc. 37-7 at 17-18 (Fletcher Dep., 194:6-195:3)]. Plaintiff "couldn't think to do [his] job" and "couldn't concentrate" [Doc. 37-1 at 19-21 (White Dep., 152:7-154:15)]. During that time, Plaintiff was also unable to travel for work [*Id.*].

In April 2019, Plaintiff's emotional distress escalated. Plaintiff sent an email to a number of SKF employees to disseminate a report he drafted [*See* Doc. 37-18]. Fletcher was on vacation at the time, but she reviewed Plaintiff's email [*Id.* (April 2, 2019 Email)]. Fletcher reprimanded Plaintiff via email, stating that "there are a few things we need to cover that cannot wait until my return," and criticizing the informality of Plaintiff's email and report [*See id.*].[4] Just two days later, on April 4, 2019, Plaintiff fell and lost consciousness in his office while discussing Fletcher's critical email and his wife's illness with Steve Wareham, a SKF human resources representative[5] [Doc. 37-1 at 13-17 (White Dep., 130:4-134:4)]. According to Wareham, Plaintiff "was extremely

---

[4] In the April 2, 2019 email, Fletcher stated, "[i]f I didn't know you and your quirky personality myself, I would strongly question the integrity of the data in this presentation. . . . This cannot continue, Tony. You are giving others the impression that you don't know how to behave in a professional manner" [Doc. 37-18]. The email copied two other SKF employees [*Id.*].

[5] Although Wareham was not the Human Resources Representative on-site at Alemite's Johnson City facility, he was responsible for providing human resources support to Group Purchasing employees across SKF, including Plaintiff [Doc. 37-2 at 9 (Wareham Dep., 21:14-25)].

6

emotional and sobbing and crying and upset" prior to losing consciousness [Doc. 37-2 at 10 (Wareham Dep., 58:14-18)].

On April 10, 2019, Plaintiff told Fletcher he felt that she was retaliating against him, to which she replied that he "[t]hrew her under the bus" by submitting a hotline complaint to corporate compliance about Unilube [Doc. 38-5 (4/10/2019 Email)]. On April 11, 2019, Plaintiff requested twelve (12) consecutive days of paid time off through the FMLA [Doc. 37-19 (4/11/2019 Email)]. That same day, Plaintiff emailed Alrik Danielson, SKF AB's President and CEO, and alleged that Plaintiff had "walked into a possible anti-trust situation" during his visit to Unilube [Doc. 37-15 (4/12/2019 Email)]. Plaintiff then forwarded that email to the Federal Trade Commission at 2:39 A.M. on April 12, 2019 with the message "Heed halp [sic] sent to the CEO of SKF" [*Id.*]. On April 13, 2019, while still on FMLA leave, Plaintiff sent over 200 text messages to Wareham over the course of twenty-four (24) hours [Doc. 37-20 (4/13/2019-4/14/2019 Text Messages)]. Plaintiff's messages covered a range of topics, including his wife's illness, his deceased son, his prior employer, the Unilube investigation, and his performance at SKF [*Id.*].

The next day, Wareham sent an email to Jon Stevens and Theodore Barry, stating:

> [I]t appears to be a very serious mental health event that is occurring with him [Plaintiff]. I saw it happen to a relative of mine many years ago . . . . It took years and things never really got back to what I would call normal. . . . I think we have [to] consider this very serious and something needs to be done to help him [Plaintiff] and get him away from his job until we understand what is going on.

[Doc. 38-14 (4/14/2019 Email)]. On April 20, 2019, Plaintiff emailed Wareham describing a legal investigation of his wife's illness, which Plaintiff tied to Unilube [Doc. 37-21 (4/20/2019 Email)]. In this email, Plaintiff stated, "I honestly do not feel my job is threatened now, and have slept good since reporting what took place. I know the investigation was closed, but I'm curious as to what was they [sic] findings" [*Id.*].

7

On May 10, 2019, Wareham met with Plaintiff to address his emotional state and work performance [Docs. 37-1 at 72 (White Dep., 305:5-15); 37-2 at 11-16 (Wareham Dep., 71:7-76:25); 37-22 (Wareham's Handwritten Meeting Notes)]. During the meeting, they discussed Plaintiff's communication style, interaction with coworkers, work product, technical writing and grammar, and time off [Docs. 37-2 at 11-16 (Wareham Dep., 71:7-76:25); 37-22]. Wareham offered Plaintiff another EAP referral, and Plaintiff agreed [Docs. 37-1 at 76 (White Dep., 314:5-19); 37-23 (5/10/2019 EAP Referral)]. Wareham also proposed short-term disability ("STD") leave as an option [Doc. 37-1 at 77 (White Dep., 315:19-24)]. Plaintiff applied for STD leave through SKF's third-party carrier, MetLife, and was approved on May 15, 2019 [*Id.* at 77-78 (White Dep., 315:3-316:21); Doc. 38-19 at 2].

While on STD leave, Plaintiff saw Dr. Thomas Floyd, a psychologist, through MetLife [*Id.* at 78-79 (White Dep., 316:6-16, 318:5-14)]. Wareham provided Plaintiff's job description to MetLife [Doc. 38-9 at 27 (Wareham Dep., 182:25)]. Wareham received updates from MetLife regarding Plaintiff's STD leave status and compliance with the EAP referral [Doc. 37-2 at 18-19 (Wareham Dep., 115:8-12, 117:20-22)].

A September 20, 2019 "Initial Functional Assessment Form" filled out by Dr. Floyd regarding Plaintiff provided "a prognosis/estimated date for return to work" of "full time by 11/1/19" [Doc. 38-11 (9/20/2019 Dr. Floyd Medical Record)]. When asked to "specify types of reasonable accommodations and the expected duration that would facilitate a re-entry into the workplace," Dr. Floyd wrote "None" [*Id.*]. Dr. Floyd also indicated that Plaintiff could "currently perform the same job at a different company" and "the same job in another department or division of the company" [*Id.*]. No Party deposed Dr. Floyd.

8

By October 2019 Plaintiff "[felt] like [he was] able to go back to work, [his] doctor and [he had] discussed it in length, and [it was] time to go back to work" [Doc. 37-1 at 83 (White Dep., 324:6-14)].  Plaintiff "didn't see any [accommodation] that needed to be made" [*Id.* at 83 (White Dep., 324:15-20)].  "In [his] mind, [Plaintiff] was able to perform the work" and "wasn't no longer disabled" [*Id.* at 83-84 (White Dep., 324:24-325:18)].

On October 4, 2019, Wareham notified Plaintiff that MetLife had suspended his STD disability on September 30, 2019 [Doc. 37-24 (10/4/2019 Text Messages)].  Plaintiff agreed to call MetLife and set November 1, 2019 as his date to return to work [*Id.*; Doc. 37-1 at 79 (White Dep., 318:21-25)].  On October 25, 2019, Wareham, on behalf of SKF, sent Plaintiff "ada information to review and complete," [Doc. 37-25 (10/25/2019 Text Messages)], with a letter that stated:

> You have been on leave since 5-15-2019.  Because you are not eligible or have exhausted the amount of leave allowed under FMLA (and/or similar state laws) — OR — Because you are in the process of applying for or are approved and receiving Long Term Disability, additional job protected time off may only be approved as an accommodation under the Americans with Disabilities Act (ADA), if reasonable. . . . To begin the interactive process, SKF USA Inc. must receive information from you and your doctor regarding your illness or injury to determine if ADA even applies to your circumstance. . . . **All of these documents must be completed and returned to SKF USA Inc., Benefits Director . . . by November 12, 2019.**

[Doc. 37-26 (10/25/2019 Letter) (emphasis in original)].  Plaintiff did not return any of the documents [Doc. 37-2 at 21 (Wareham Dep., 123:19-20)].

On October 25, Wareham also notified Plaintiff that Plaintiff would need to complete a psychological fit-for-duty exam before returning to work [Doc. 37-1 at 80 (White Dep., 320:1-4)]. Wareham requested the fit-for duty exam "[b]ased on the level of the event that caused the breakdown, all the text messages, the text storm [Plaintiff] sent [him] was still in [his] memory as

something that [he] wasn't sure if [Plaintiff] was ready to come back or not" [Doc. 37-2 at 20 (Wareham Dep., 120:15-21)]. Plaintiff agreed to the exam [Doc. 37-1 at 80 (White Dep., 320:18-22)].

On November 2, 2019, Dr. Steven Lawhon, a licensed clinical psychologist, evaluated Plaintiff's fitness for duty [Doc. 37-27 at 2]. It is unclear what specific information Dr. Lawhon received and reviewed in advance of his evaluation.[6] Dr. Lawhon's "Psychological Evaluation" Report states that as part of the evaluation, he received "[h]istorical data" "provided by [Plaintiff], his employer, and by his treating psychologist, Dr. Mike Floyd" [*Id.*]. Dr. Lawhon stated that "[t]hese reports appear to be reliable" [*Id.*]. Dr. Lawhon did not note or analyze Plaintiff's specific job duties in the Report [*See* Doc. 37-27]. But he did indicate that the "<u>EVALUATION PROCEDURE</u>" included "Consultation with Steve Wareham," "Consultation with Holly Fletcher," and "Consultation with Dr. Mike Floyd" [*See id.* at 2]. Wareham asserted that he "spoke with" Dr. Lawhon in advance of the evaluation "about Mr. White's behavior and performance issues," and Plaintiff's "job duties and responsibilities with the Company as a Senior Buyer in purchasing, which included, among other things, traveling and dealing with internal and external customers, including internationally" [Doc. 54-1 at 3 (Affidavit of Steve Wareham ("Wareham Aff."), ¶ 14)].

In his November 20, 2019 Report, Dr. Lawhon concluded that Plaintiff "is not fit to return to duty at the current time due to his current mental status and psychological functioning" [Doc. 37-27 at 7]. Dr. Lawhon assessed that Plaintiff "currently poses a risk to both himself and others in the workplace" [*Id.*]. But Dr. Lawhon recommended that "Mr. White should continue

---

[6] As discussed further below, the later-submitted affidavit of Dr. Lawhon, [*see* Doc. 54-6 at 2 (Affidavit of Dr. Steven Lawhon ("Dr. Lawhon Aff."))], does not change this fact.

treatment with his current mental health provider, Dr. Mike Floyd" and that "[o]nce Mr. White completes his treatment with Dr. Floyd, an assessment of his risk and psychological functioning could then be obtained from Dr. Floyd based on his work with him" [*Id.*]. No Party deposed Dr. Lawhon.

On November 19, Wareham asked Dr. Lawhon if Dr. Lawhon could assist in getting Plaintiff's "current release to work from Dr. Floyd revised to reflect [Dr. Lawhon's] findings and recommendation that he [Plaintiff] is not ready to return to work" [Doc. 38-26 at 2 (11/19/2019 Email)]. On December 12, 2019, Wareham notified Plaintiff that Dr. Lawhon concluded that Plaintiff "need[ed] some more time before returning to work" and that "[Dr. Lawhon] said Dr. Floyd is in agreement with this" [Doc. 37-28 at 3 (12/12/2019 Text Messages)].

However, Dr. Floyd continued to treat Plaintiff. And medical records show that on December 28, 2019, Dr. Floyd assessed Plaintiff again [*See* Doc. 38-13]. In a "Supplemental Functional Assessment Form," dated December 28 Dr. Floyd concluded that Plaintiff "is fit to return to work" [Doc. 38-13 at 3].

During this timeframe, Wareham also recommended that Plaintiff reopen his STD claim to obtain the remainder of his benefit while applying for long-term disability ("LTD") benefits [Doc. 37-28]. Following Wareham's recommendation, in December 2019, Plaintiff submitted a claim to MetLife for LTD benefits [Doc. 37-1 at 87-88 (White Dep., 328:13-329:1)]. But on January 21, 2020, Plaintiff contacted MetLife and stated that he was able to return to work and was not disabled [*Id.* at 88 (White Dep., 329:19-23)].

A series of relevant events occurred quickly thereafter. On February 11, 2020, Wareham emailed Dr. Lawhon and stated "[p]er Tony White today Dr. Floyd is telling Tony he can now return to work. . . . We thought he was unfit to return to work per your review" [Doc. 38-23 at 2].

In a follow up discussion on February 12, 2020, Dr. Lawhon "emphatically stated that Mr. White was not ready to return to work" [*See* Doc. 54-1 at 5; *see also* Doc. 37-31 at 5; 38-24]. On February 12, Plaintiff told Wareham that Plaintiff's LTD claim would likely be denied because "[f]rom his perspective, [Plaintiff] tells them [MetLife] nothing keeps [him] from working" [Doc. 37-29 (2/11/2020 Text Messages)]. On February 18, 2020, Wareham told Dr. Lawhon that he "may decide to term[inate] him [Plaintiff] if he can't get LTD" [Doc. 38-16]. MetLife denied Plaintiff's LTD claim on February 21, 2020 [Doc. 38-19 (MetLife Review)].

On February 26, 2020, SKF terminated Plaintiff's employment [Doc. 37-31]. Wareham was the sole decisionmaker [Doc. 38-9 at 27 (Wareham Dep., 182:7-22)]. Wareham testified that he decided to terminate Plaintiff based on "Mr. White's mental health evaluation as opined by Dr. Lawhon which summarized the events" and because "the Doctor [Dr. Lawhon] felt that he [Plaintiff] just wasn't at a place where he could come back to work" [*Id.* (Wareham Dep., 182:20-22)]. When asked whether Plaintiff believed he was terminated because he was regarded as having a disability, Plaintiff responded, "[n]o—the only thing I can think of, the only logical reasoning, was—it started in Dallas . . . ," referring to his visit to Unilube [Doc. 37-1 at 95 (White Dep., 369:5-14)].

Plaintiff's Amended Complaint [Doc. 16] alleges three claims against Defendants. *First*, Plaintiff alleges that Defendants violated the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.*, (ADA) by terminating Plaintiff's employment rather than working to accommodate Plaintiff or engaging in the interactive process (Count One) [*Id.* at 5-6]. *Second*, Plaintiff asserts a "regarded as" claim under 42 U.S.C. § 12102(3), claiming that Defendants terminated Plaintiff because they "continued to regard him as disabled" when he had

recovered and terminated him on that basis (Count Two) [*Id.* at 6-7].[7]  ***Third***, Plaintiff asserts a claim under the Tennessee Public Protection Act, Tenn. Code Ann. §50-1-304 (TPPA), alleging that Plaintiff's "refusal to participate in or remain silent about illegal activities" related to potential antitrust violations regarding Unilube "was the sole cause of Defendants' decision to terminate him" (Count Three) [*Id.* ¶ 44].

Defendants moved for summary judgment on all counts [Doc. 37].  Plaintiff opposed [Doc. 38].  The Court held a hearing on Defendants' motion [*See* Doc. 49].  Following the hearing, the Court ordered each Party to submit supplemental briefing regarding Count Two [*See* Doc. 50 at 2].  The Parties each submitted a supplemental brief [*See* Docs. 53, 54].  Defendants also submitted additional affidavits from Wareham, Nancy McGinty, and Dr. Lawhon as part of their supplemental brief [*See* Docs. 54-1; 54-5; 54-6)].  Plaintiff moved to strike all three affidavits, arguing that (1) the affidavits of Wareham and McGinty contain inadmissible hearsay, [*See* Doc. 57 at 2-5]; (2) Wareham's affidavit contradicts his earlier deposition testimony, [*Id.* at 3]; and (3) the affidavit of Dr. Lawhon "improperly attempts to shoehorn into the record expert witness documents and testimony which were not previously disclosed, and the statements are not made on the basis of personal knowledge," [*Id.* at 5-8].  Defendants opposed [*See* Doc. 58].

---

[7] The heading of Count Two is "ADA Retaliation" [Doc. 16 at 6].  However, the substance of Count Two clarifies that Plaintiff intended to assert a "regarded as" claim under the ADA [*See id.*].  Plaintiff explicitly pleaded the operative subsection of the ADA—42 U.S.C. § 12102(3)—which "make[s] it a separate violation if an otherwise non-disabled individual suffers an adverse employment action, like termination, based on his perceived impairment by the employer" [*Id.* ¶ 40].  Accordingly, Plaintiff pleaded a "regarded as" claim despite counsel's inattentive drafting.  *See Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001) ("[T]his court has made clear that the label which a plaintiff applies to a pleading does not determine the nature of the cause of action which he states.").  And the Court will not strike Count Two.

## II. PLAINTIFF'S MOTION TO STRIKE THE AFFIDAVITS OF WAREHAM, MCGINTY, AND DR. LAWHON

The Court addresses Plaintiff's "Motion to Strike" first [Doc. 57]. At summary judgment, the Court only considers evidence that is admissible. *See M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 446 (6th Cir. 2021). Also, under the "sham" affidavit doctrine, in some limited circumstances, a district court may strike a post-deposition affidavit submitted by a ***nonmoving party*** at the summary judgment stage. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). But the Court must first "determine whether the affidavit directly contradicts . . . prior sworn testimony." *Id.* (citation omitted). If there is no direct contradiction, "the district court should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.*

### A. Plaintiff Presents No Legitimate Basis To Strike Wareham's Affidavit.

Plaintiff's argument that the Court should strike Wareham's affidavit fails. ***First***, paragraph 16 of the Wareham affidavit, the only paragraph to which Plaintiff specifically objects on hearsay grounds, is not inadmissible hearsay [*See* Doc. 57 at 2]. Paragraph 16 describes a conversation that Wareham had with Dr. Lawhon on February 12, 2020 and a statement Dr. Lawhon made to Wareham regarding Dr. Lawhon's assessment of Plaintiff's readiness to return to work [*See* Doc. 54-1 at 5]. But as Defendants explained, they do not offer Dr. Lawhon's statement for the truth of the matter asserted [*See* Doc. 58 at 2]. *See* Fed. R. Evid. 801(d) (defining hearsay as a statement "a party offers in evidence to prove the truth of the matter asserted in the statement"). Instead, they offer the statement to show "the effect on the listener"—here, Wareham—a legitimate nonhearsay purpose [*See* Doc. 58 at 2]. *See Biegas v. Quickway Carrier, Inc.*, 573 F.3d 365, 379 (6th Cir. 2009) ("A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." (citation omitted)).

14

***Second***, Defendants' submission of the Wareham affidavit does not fall within the "sham" affidavit doctrine. As an initial matter, the "sham" affidavit doctrine does not apply here because Defendants—the moving Parties—submitted the affidavit. *See Reed v. City of Memphis*, 735 F. App'x 192, 198 (6th Cir. 2018) (citation omitted) (emphasis in original). "If an affidavit conflicts with the deposition testimony of a summary judgment *movant*, the opposite party receives the *benefit* of the conflict under the requirement that evidence is construed in the light most favorable to the non-moving party." *Id.* (citation omitted) (emphasis in original). Further, even if the doctrine could apply, it would not here because the salient portion of the Wareham affidavit, paragraph 14, is not directly contradicted by Wareham's deposition. *See Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006) (narrowly defining the term "direct contradiction"). Paragraph 14 describes certain information Wareham provided to Dr. Lawhon at some time before Dr. Lawhon evaluated Plaintiff [*See* Doc. 54-1 at 4]. But Plaintiff has not identified any portion of Wareham's deposition that necessarily contradicts that description [*See* Doc. 57 at 3-4 (describing one specific conversation that Wareham had with Dr. Lawhon on a conference call); *see also* Doc. 58-1 at 9-10 (Wareham Dep., 150:7-151:10) (describing what Wareham "remember[ed]" from the conference call)]. Accordingly, the Court **DENIES** Plaintiff's "Motion to Strike" as it relates to the Wareham Affidavit [Doc. 54-1].

### B. Because Neither The Dr. Lawhon Nor McGinty Affidavits Impact The Court's Adjudication Of Defendants' Motion For Summary Judgment, The Court Denies This Portion of Plaintiff's Motion to Strike as Moot.

Even if the Court considers each of the allegedly offending statements in the Dr. Lawhon and McGinty affidavits, the outcome of Defendants' Motion for Summary Judgment would be the same. Specifically, Dr. Lawhon's affidavit fails to identify whether he was "aware of Mr. White's role and job functions" or analyzed them when he evaluated Plaintiff in November 2019 [*See*

Doc. 54-6 at 2 (stating that "[i]t is my understanding"—describing a current understanding, not describing Dr. Lawhon's understanding at the relevant time)]. Dr. Lawhon's understanding *at the time of Plaintiff's evaluation and Dr. Lawhon's Report* is relevant to this case—not Dr. Lawhon's current understanding. Further, Dr. Lawhon's affidavit does not identify whether his opinion that Plaintiff was not "fit to return to work" in "February 2020," is based on his current understanding or his understanding as of February 2020 [*See id.* at 3]. And the affidavit does not state that Dr. Lawhon shared any basis for any opinion that he may have had in February 2020 with Wareham, the sole decisionmaker in Plaintiff's termination [*See id.*]. The McGinty affidavit similarly fails to move the needle because the Court must view the facts in the light most favorable to Plaintiff and may not grant summary judgment where genuine disputes of material fact remain. *See Nat'l Satellite Sports, Inc.*, 253 F.3d at 906-07. Accordingly, the Court **DENIES** Plaintiff's Motion to Strike as **MOOT** with respect to the affidavit of Dr. Lawhon and McGinty.

### III.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Next, the Court addresses Defendants' "Motion for Summary Judgment" [Doc. 37]. Under Federal Rule of Civil Procedure 56, summary judgment is only appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. The Court refrains from "weigh[ing] the evidence and determin[ing] the truth of the matter," and instead simply asks, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 251-52 (1986).

16

The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has met this burden, the opposing party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; Fed. R. Civ. P. 56). A genuine issue for trial exists "when there is sufficient 'evidence on which the jury could reasonably find for the plaintiff.'" *Nat'l Satellite Sports, Inc.*, 253 F.3d at 907 (quoting *Anderson*, 477 U.S. at 249). "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247-48).

## A. Defendants Are Entitled To Judgment On Plaintiff's Claim That They Failed To Accommodate Or Engage In The Interactive Process (Count One).

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of a disability," 42 U.S.C. § 12112(a), and defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability," *id.* at § 12112(b)(5)(A). To establish a prima facie case for failure to accommodate, "a plaintiff must show that (1) [he] was disabled within the meaning of the [statute]; (2) [he] was otherwise qualified for [his] position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about [his] disability; (4) [he] requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022) (quoting *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 669 (6th Cir. 2020)).

The ADA "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) (internal quotations and citation omitted). The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). But an employer's duty to engage in the interactive process is not triggered unless and until an employee requests an accommodation. *See King*, 30 F.4th at 564; *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 421 (6th Cir. 2020) (citing *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 849 (6th Cir. 2018)); *Rorrer v. City of Stow*, 743 F.3d 1025, 1031 n. 1, 1045 (6th Cir. 2014) (citing *Keith*, 703 F.3d at 923, 929). The Sixth Circuit has "generally given plaintiffs some flexibility in how they request an accommodation." *King,* 30 F.4th at 564 (quoting *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015) (citing *Talley v. Family Dollar Stores, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008))). "[T]he employee does not need to explicitly use the word 'accommodation.'" *King*, 30 F.4th at 564 (citing *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)). But the employee must affirmatively make some sort of request for an accommodation. *See Mobley*, 603 F. App'x at 413 (citing *Talley*, 542 F.3d at 1108; *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015).

Here, even assuming Plaintiff had a "disability" within the meaning of the ADA, Count One fails because Plaintiff did not request an accommodation. Plaintiff (1) represented to Defendants that he did not need an accommodation and "[felt] like [he was] able to go back to work" as early as October 2019, [Doc. 37-1 at 83-84, 92 (White Dep., 324:15-325:20, 364:23-25)]; (2) failed to return documents that his employer provided to request an ADA accommodation, [Doc. 37-2 at 23 (Wareham Dep., 176:8-12)]; and (3) agreed that he did not need an accommodation, [*see* Docs. 38-11; 38-13]. In fact, there is no evidence that Plaintiff requested

18

any accommodation at all when he sought to return to work. Accordingly, Plaintiff cannot establish a prima facie case for failure to accommodate or engage in the interactive process. And Defendants are therefore entitled to summary judgment on Count One.

### B. Genuine Disputes of Material Fact Preclude Summary Judgment on Plaintiff's "Regarded As" Claim (Count Two).

As discussed above, the ADA prohibits discrimination "on the basis of disability." 42 U.S.C. § 12112(a). "[D]isability" includes "being regarded as having such an impairment." 42 U.S.C. § 12102(1).

> [A]n individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.[8]

42 U.S.C. § 12102(3)(A). A claim brought under this section of the ADA is commonly referred to as a "regarded as" claim. *See, e.g., EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 440 (6th Cir. 2006).

"[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that [the] employer believed [he] had a 'physical or mental impairment.'" *Harrison v. Soave Enters. L.L.C.*, 826 F. App'x 517, 526 (6th Cir. 2020), *cert. denied sub nom. Parts Galore L.L.C. v. Harrison*, 141 S.Ct. 2570 (2021) (quoting *Babb*, 942 F.3d at 318). "Once an employee establishes that the employer perceived him or her as having an impairment, the employee must demonstrate that the perceived impairment was a 'but-for' cause of the employer's adverse

---

[8] This "regarded as" provision "shall not apply to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B). But this is an affirmative defense that the employer must raise. *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). Here, Defendants did not raise this affirmative defense.

decision." *See EEOC v. W. Meade Place, LLP*, 841 F. App'x 962, 967 (6th Cir. 2021) (quotations and citations omitted).

Plaintiff does not argue that there is any direct evidence of discrimination. However, he may still "point to circumstantial evidence of discrimination under the well-trod *McDonnell Douglas* burden-shifting framework" to establish "but for" causation. *See Babb*, 942 F.3d at 319-20 (citation omitted). First, plaintiff must establish a prima facie case of discrimination. *See id.* Generally, to establish a prima facie case of discrimination, Plaintiff must show that (1) he "is disabled," (2) he "is otherwise qualified for the position," (3) he "suffered an adverse employment action," (4) "the employer knew or had reason to know of" Plaintiff's disability and (5) the "position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.* at 320 (cleaned up). However, the standard five-part prima facie test "does not map neatly onto a 'regarding as claim.'" *See id.* at 320 n.8. The Sixth Circuit has stated that "elements (1) and (4) are already captured in the threshold inquiry into whether the employee has adduced evidence showing that their employer believed they had a 'physical or mental impairment.'" *Id.* "And, although a 'regarded as' plaintiff still must show that they are 'qualified' for a position, inquiries into 'reasonable accommodations' are irrelevant." *Id.* (cleaned up); *see also Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, at *11 n.13 (6th Cir. 2012).

"To show that [he] is otherwise qualified for a position . . . an employee must show that [he] can perform the essential functions of a job." *Hostettler*, 895 F.3d at 854. "The ADA mandates an individualized inquiry." *See Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). In certain circumstances, an employer may be entitled to rely on a medical opinion in assessing whether an employee can perform the essential functions of a job. *See id.* at 645-46. But that medical opinion must be objectively reasonable. *See Michael v. City of Troy Police Dep't*,

808 F.3d 304, 307 (6th Cir. 2015). "Courts need not defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence." *Holiday*, 206 F.3d at 645. A medical opinion may conflict with another medical opinion and still be objectively reasonable. *See Michael*, 808 F.3d at 307 (citing *Bragdon v. Abbott*, 524 U.S. 624, 650 (1998)). An employer may even reasonably favor one medical opinion over another in some circumstances, for example, if one physician "did not have current and complete information when making their recommendations," *see Wurzel*, 482 F. App'x at *16, or the chosen opinion cites a credible scientific basis for disagreeing with the contrary opinion, s*ee Michael*, 808 F.3d at 307. But conflicting medical opinions may also signify that there are genuine disputes of material fact to be resolved by a jury. *See Justice v. Crown Cork and Seal Co.*, 527 F.3d 1080, 1090 (10th Cir. 2008) (finding a material issue of fact existed in part because the employer relied on one medical opinion and ignored subsequent conflicting opinions).

If an employee can establish a prima facie case, "the employer must then offer a 'legitimate explanation for its action.'" *Babb*, 942 F.3d at 320. If the employee does so, "'the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual.'" *Id.* (internal citations omitted).

Here, genuine disputes of material fact preclude summary judgment on Count Two. ***First***, a reasonable jury could easily find that Defendants regarded Plaintiff as disabled when they terminated him. *See Babb*, 942 F.3d at 319. The record shows not only that Defendants' employees, including Wareham, openly expressed concern about Plaintiff's "actual or perceived . . . mental impairment," but also that Wareham specifically suggested that Plaintiff seek disability benefits and apply for ADA accommodations in the months before Wareham decided to terminate Plaintiff. Further, Wareham asked Plaintiff to undergo a fit-for-duty exam after

Dr. Floyd assessed that Plaintiff was fit to return to work, confirming that Wareham viewed Plaintiff as suffering from a mental impairment [Docs. 37-1 at 80 (White Dep., 320:1-4); 37-2 at 20 (Wareham Dep., 120:15-21); 37-28].  Defendants' argument that Plaintiff's claim is foreclosed because Plaintiff testified that he does not believe that he was fired because he was regarded as disabled does not change the outcome.  While Plaintiff's own words may ultimately prove damning before a jury, Plaintiff's subjective belief regarding the reason for his termination is not controlling at summary judgment.  *See Babb*, 942 F.3d at 320.

**Second**, as to Plaintiff's prima facie case, the only question at issue is whether Plaintiff was otherwise qualified for his position.  Here too, genuine disputes of material fact preclude summary judgment.  *See Kirilenko-Ison*, 974 F.3d at 660.  Defendants relied on Dr. Lawhon's November 20, 2019 Report and a subsequent February 12, 2020 conversation between Wareham and Dr. Lawhon to determine that Plaintiff was unable to return to work, or not "otherwise qualified" to work, as a Senior Buyer on February 26, 2020.  But there was a difference in opinion between Dr. Lawhon and Dr. Floyd as to whether Plaintiff was qualified to return to work on February 26.  And on this record, it's unclear what Dr. Lawhon considered and analyzed at the relevant time in reaching his opinion.  As such, the Court cannot conclusively determine that Dr. Lawhon's opinion reflects the "individualized inquiry" required under the ADA, *see Holiday*, 206 F.3d at 645, or that his opinion was objectively reasonable as a matter of law such that Defendants' reliance on the opinion entitles them to judgment, *see Michael*, 808 F.3d at 307.  This leaves genuine disputes of material fact for a jury.  *See Justice*, 527 F.3d at 1080; *Wurzel*, 482 F. App'x at *16.

For example, a reasonable jury could conclude that Defendants' reliance on Dr. Lawhon's November 20, 2019 Report and February 12, 2020 statement does not preclude liability because

22

the Report and statement did not reflect "the best available objective evidence" as of February 26, 2020. *See Wurzel*, 482 F. App'x at *11. This is especially true because Dr. Lawhon's November 20 Report recommended that Plaintiff "should continue treatment with . . . Dr. Floyd" and stated that "an assessment of [Plaintiff's] risk and psychological functioning" could be obtained from Dr. Floyd "[o]nce Mr. White completes his treatment" [Doc. 37-27 at 7]. After continued treatment, Dr. Floyd provided a December 28, 2019 assessment, indicating that Plaintiff was "fit to return to work" [Doc. 38-13 at 3]. And it's unclear how, if at all, Dr. Lawhon considered Plaintiff's continued treatment and Dr. Floyd's later-in-time assessment before Dr. Lawhon "emphatically stated that Mr. White was not ready to return to work" on February 12, 2020 [*See* Doc. 54-1 at 5]. And there is nothing in the record explaining the contemporaneous reasoning or considerations that led to Dr. Lawhon's February 12 statement. *See Justice*, 527 F.3d at 1080. Viewing the facts in the light most favorable to Plaintiff, he has established a prima facie case. *See Babb*, 942 F.3d at 319-20.

*Finally*, the burden shifts to Defendants to "offer a legitimate explanation" for their decision to terminate Plaintiff. *See Babb*, 942 F.3d at 320 (cleaned up). But here too, these genuine disputes of material fact preclude the Court from determining that it was "legitimate" for Defendants to terminate Plaintiff based on Dr. Lawhon's Report and statement.[9] On this record genuine disputes of material fact exist as to Count Two, and there is sufficient evidence on which

---

[9] Defendants aver that "SKF did not rely *solely* on Dr. Lawhon's report" in deciding to terminate Plaintiff [*See* Doc. 54 at 4]. This may be true; Wareham had many interactions with Plaintiff and may have formed his own assessment of Plaintiff's fitness. But Wareham, the sole decisionmaker in this case, stated under oath that his decision to fire Plaintiff was based on "Mr. White's mental health evaluation as opined by Dr. Lawhon which summarized the events" and the fact "that the Doctor felt that he [Plaintiff] just wasn't at a place where he could come back to work" [*See* Doc. 38-9 at 27 (Wareham Dep., 182:7-22)]. Viewed in the light most favorable to Plaintiff, the Court takes Wareham at his word.

23

a jury could reasonably find for Plaintiff. *See Nat'l Satellite Sports, Inc.*, 253 F.3d at 907. Accordingly, the Court denies summary judgment on Count Two.

### C. Defendants Are Entitled to Judgment on Plaintiff's TPPA Claim (Count Three).

Tennessee is an at-will employment state. *Franklin v. Swift Transp. Co.*, 210 S.W.3d 521, 527 (Tenn. Ct. App. 2006). But the TPPA provides that "[n]o employee shall be discharged or terminated *solely for* refusing to participate in, or for refusing to remain silent about, *illegal activities*." Tenn. Code Ann. § 50-1-304(b) (emphasis added). To prevail under the TPPA, a plaintiff must establish (1) his status as an employee of the defendant employer; (2) his refusal to participate in or remain silent about "illegal activities"; (3) that he was terminated; and (4) an "exclusive causal relationship between [that termination and his] refusal to participate in or remain silent about illegal activities." *Franklin*, 210 S.W.3d at 528.

The TPPA specifically requires a plaintiff to "show an *exclusive* causal relationship between their protected activity and the adverse employment action." *Levan v. Sears, Roebuck & Co.*, 984 F. Supp. 2d 855, 872 (E.D. Tenn. 2013) (emphasis added). Plaintiff's alleged protected activity must be the "sole reason" for his termination. *See Hugo v. Millennium Lab'ys, Inc.*, 590 F. App'x 541, 544 (6th Cir. 2014) (citing *Guy v. Mut. of Omaha Ins. Co.*, 79 S.W.3d 528, 537 (Tenn. 2002) (emphasis omitted)). Indeed, under the TPPA "a defendant can rebut a plaintiff's claim simply by 'articulat[ing] a non-retaliatory reason for [the plaintiff's] discharge.'" *Sourinho v. Rich Prods. Co.*, No. 21-5289, 2021 WL 4735844, at *3 (6th Cir. Oct. 12, 2021) (citing *Williams v. City of Burns*, 465 S.W.3d 96, 115 (Tenn. 2015)). "All that is necessary is for the defendant to 'introduce admissible evidence showing that . . . there was at least one non-retaliatory'" reason for the discharge. *Sourinho*, 2021 WL 4735844, at *3 (citing *Williams*, 465 S.W.3d at 115). The burden then shifts back to the plaintiff to demonstrate that the proposed non-retaliatory reason is

24

pretext for discrimination under the TPPA. *See Conley v. Yellow Freight Sys., Inc.*, 521 F. Supp. 2d 713, 730 (E.D. Tenn. 2007). A plaintiff thus has "a formidable burden in establishing" a cause of action under the TPPA. *Darnall v. A+ Homecare, Inc.,* No. 01-A-01-9807-CV-00347, 1999 WL 346225, at *5 (Tenn. Ct. App. June 2, 1999).

Here, for purposes of summary judgment,[10] no Party disputes that Plaintiff (1) was an employee of Defendants, (2) refused to remain silent about potential antitrust violations with Unilube, and (2) was ultimately terminated [*See* Docs. 37 at 19; 38 at 23]. This leaves only a dispute regarding whether Plaintiff's employment was terminated ***solely*** due to his refusal to remain silent about any illegal activities [*Id.*].

Plaintiff failed to establish this element. ***First***, he has not shown that his refusal to remain silent about potential antitrust violations involving Unilube was the sole cause of his termination. *See Guy*, 79 S.W.3d at 535. Plaintiff simultaneously alleges that he was terminated because he refused to remain silent about SKF's relationship with Unilube and because Defendants discriminated against him in violation of the ADA. This precludes him from showing that any refusal to remain silent about Unilube was the sole cause of his termination. *See Eddy v. BlueCross BlueShield of Tennessee, Inc.*, No. 3:19-CV-376, 2021 WL 4270154, at *10 (E.D. Tenn. Sept. 20, 2021).

***Second***, even if Plaintiff could allege that Defendants discharged him solely for his refusal to remain silent about Unilube, Defendants have presented a non-retaliatory reason for discharge. Defendants aver that Plaintiff was terminated due to Dr. Lawhon's assessment that Plaintiff was not qualified to return to work [Docs. 38-9 at 27 (Wareham Dep., 182:7-22); 37-31]. For purposes

---

[10] Defendants reserve the right to later argue that no "illegal activities," as that term is defined in the TPPA, occurred [Doc. 37 at 21].

of the TPPA, the employer's proffered reason for termination "need not be a sound one, it need only be a reason *other than* retaliation" for refusing to remain silent. *See Williams*, 465 S.W.3d at 115. And Plaintiff does not argue that Defendants' proffered reason is pretext. Accordingly, Defendants are entitled to summary judgment on Count Three.

## IV. CONCLUSION

For the reasons sets forth in this Memorandum Opinion and Order, the Court **DENIES** Plaintiff's Motion to Strike, [Doc. 57], and **GRANTS** Defendants' "Motion for Summary Judgment," [Doc. 37], **IN PART.** The Court **GRANTS** Defendants summary judgment on Counts One and Three but **DENIES** Defendants summary judgment on Count Two.

Within **fourteen (14) days** of the entry of this Order, the Parties **SHALL** file a joint status report outlining the status of the case and providing a proposed schedule for the remainder of this action. For convenience of the Parties, the Court's Judicial Preferences and a Sample Civil Scheduling Order are available at https://www.tned.uscourts.gov/content/katherine-crytzer-united-states-district-judge.

IT IS SO ORDERED.

KATHERINE A. CRYTZER
United States District Judge

26